v. Johnston, Case No. 25753, and we'll start with that. Mr. Siegel, good to see you again. Thank you. May it please the Court, Jonathan Siegel for the United States. The District Court manifestly erred at every step of its analysis. In light of those errors, the District Court's order excluding relevant and reliable DNA evidence in this rape case was an abuse of discretion and should be reversed. And with the Court's permission, I'd like to start with relevance under Rule 401, both because it's foundational and because I'm hopeful that I can address it fairly quickly. The District Court considered the DNA evidence in a vacuum and failed to consider the evidence's strong probative value as corroboration for Jane Doe's account. Doe is expected to testify that the defendant raped her on the corner of his bed, on top of the comforter, and ejaculated both inside and outside of her vagina. The evidence here will show that on top of the comforter, in the corner where Doe was raped, seven semen stains were found. In four out of those seven semen stains, between about 70 to 90 percent of the DNA was attributable to Doe. The remainder was a mixture of the defendant and Doe's mother, Monica, whose DNA was found in every tested stain on the bed. That evidence is consistent with Doe's account. It fits her testimony, and it therefore corroborates her account. Let's say that we agree with you. Are you arguing that that somehow affects the separate 702 analysis? No, Your Honor. But the District Court held both under 702 and 401. If it gets through 702, it's definitely relevant, right? Absolutely. I understand. So the District Court said that the DNA evidence doesn't make it more likely that one version of events is right than the other. Now, I understand you're saying that if you understand it in light of the whole case, it actually does make one more likely. But even if it were true that the evidence could come in, and if you interpret it this way, it's consistent with the government's account. If you interpret it that way, it's consistent with the defendant's account. That would still mean it's relevant, right? Yes, Your Honor. It's like you're interpreting the evidence. You could see it this way, it would support this version. You could see it this way, it supports that version. Like relevance, it doesn't mean that it's dispositive or that it shows that one is right and one is wrong. It just means that it makes – it could make one more likely. And even if that involves interpretation, that doesn't matter, right? So like even saying you could see it either way, that's a kind of concession that it is relevant, isn't it? Yes, Your Honor. I don't think Mr. Siegel is going to disagree with any of that. That's right. And again, the point here is the corroboration. And I think the principle really is clear if you consider it from the other direction. Let's say they had tested it and there had been no semen on the bed, or that they had not found Doe's DNA, or that her DNA had only been at trace amounts sort of comparable to everyone else. That would be exculpatory. That would be relevant to help the defense, and we'd have no argument. And that is when we know there are three other biological relatives in the house who spent – who consistently spent time on the bed and on the comforter. And, you know, the way biological relatives work is they share – they usually share alleles, right? That's sort of how this works. So how do we really know how many contributors there were, how much of this – the sample is attributable to Jane Doe as opposed to her full biological sibling, for example, who also spent time on the bed? How can we really know any of that when those three other family members weren't included? Sure. So let me turn to then the Daubert issues, which I think is what Your Honor is getting to. The district court found that the number of contributors analysis here was unreliable because there were relatives involved. But what the undisputed testimony was is that there is one reliable method to calculate the number of contributors, and that's what was used here. And that is the same method that is used both if there are related people and if there are unrelated people. But all it really tells you is the minimum number of contributors, right? Like if you have five different markers, each human can only have two, so that's a minimum of three. But it could be 12. No, Your Honor. That's – there is a method called the maximum allele method. Right. That's not what was used here. What was used here was both considering the minimum alleles, maximum alleles, which has the issues that you raised, but also peak heights. And when there are different people who – even relatives, their alleles will be in different – will not be exactly the same, the peak heights will account for that. And that's why –  So in this case, the peak heights were consistent across samples. So if there was a mass child behind the two parents, you'd expect more variation in the peak heights, right? You expect different ratios. And the one stain that shows uneven peak heights where Green decided that there was a fourth contributor shows that she was applying a method that would allow you to detect a fourth contributor, right? That's right. But it's not possible for Jane Doe's DNA to be explained by a mass child, right? Because Jane Doe has a father who's not Johnston and is not shared with the other biological child, and so therefore there's the presence of a unique allele, right? That's exactly right. And in fact, as Talifutt, one of the experts who testified, said – and this is at page 205 of the appendix where he has a chart – Doe has 12 unique alleles that neither her mother nor the defendant have. But her sibling has, perhaps. We don't know, right? No, Your Honor. Well – We don't know. Well, her – she only has half-siblings. Those siblings – Okay, right. Those 12 unique alleles came from her father.  Doe – excuse me. The defendant and Monica's children can't have those alleles because we know what their parents have. Well, they could have the alleles, but they could only have the alleles to the extent that, like, anybody in the population might end up with the same allele as another person, right? So it would be a kind of low – very low likelihood, and you can kind of assume that it's not going to be the same. No, Your Honor. As to Doe – as to the defendant and Monica's children, because we know the defendant and Monica's DNA, we know their alleles, that defines what their children could have. Their children can only have DNA they get from their parents. Right. They're not going to share it with the two – she's not going to share it with the two parents. And so we – And she has a half-sibling where we don't have the sample. I mean, I understand this is very low likelihood. It's, like, not impossible that the other father of the other child just happens to have the same allele as the second father and passed on the same allele. It's very unlikely, and it's the kind of odds that you would have about just sharing alleles with somebody else in the population. Yeah. And so I agree with that as to one of her half-brothers. As to the defendant's biological children, it's actually not possible for them to have that.  That's right. Yeah, yeah. And that's – again, Caliphate says that in his affidavit. As for the half-brother, it's exactly as Your Honor said. She would only be expected to share 25 percent of her DNA with her half-brother. They have different fathers. Those 12 unique alleles that she has come from her father, who's not related to anyone. So the odds that her half-brother would have not only all 12 of those alleles, but across all 21, all of the same alleles, is vanishingly small. And that's why the expert said there is no evidence here for any other children to be included in these mixtures. And given that there's no evidence for any other child to be included, that's why Caliphate said in his affidavit applying the related likelihood ratio would actually not be appropriate. So the odds would be very low, but then the likely – I guess maybe you were about to say this, and I interrupted, so you can continue if that's accurate. But the likelihood ratio for a related contributor, you know, while still high, would not be as high as an unrelated contributor, right? Well, the question – the question here is presented of which likelihood ratio should be applied. The related likelihood ratio deals with an unknown relative. And here – and I see my time's up, but if I could answer the Honor – the Court's – Judge Minashi's question. There isn't – there aren't unknown relatives here. Well, there are unknown relatives to the lab, because even though their protocols say to get it, they didn't get it. Well, what the lab said – and this is, again, it's sealed – this is a sealed Appendix 200. The lab said without getting those, it might be inconclusive. What ended up happening is that they looked at the results, and based on what they did know about these children, they were able to say, we actually don't need them. Right. So the protocols of the lab say something like if there are related – the possibility of related contributors, you need to be very careful about it and see if you can deduce the separate contributors, right? That's right. And they say that they can deduce it here because of the peak ratios across the samples. And because – There are unique alleles of Doe compared to the other contributors. That's right. And Califitt said that at 205 of the Appendix, and Green said at page 515. So how would this work? So let's say you introduced the likelihood ratios that said there's a continuum to one chance that it's these three contributors as compared against somebody else in the world. The defense would maybe cross-examine the expert and say, well, if you tested it against relative contributor, wouldn't it be a different likelihood ratio? And what would the expert say? The expert would say something like, well, I've already determined before getting to the likelihood ratio that that's not a contribution to the sample. That's right. If we ran such a test, it would be a lower number, but it would still be extremely unlikely. Well, I don't know that the expert could opine on what the result of a test that they didn't run would be. But what the expert can say is – Because of Crawford or because of – Well, I just don't – I think generally an expert wouldn't opine on something they haven't done. But what the expert can say is in terms of other relatives, there are three other relatives who are even hypothetically possible contributors. Two of them are the biological child of the defendant and Monica, Doe's mother. And as a matter of genetics, they cannot explain the 12 unique alleles that are seen here that are attributed to Doe. All that leaves then is T.L., the other stepbrother. And as both experts did opine, that would require that T.L., although he is a half-brother and would be expected to share 25 percent of his DNA, that would require him to share all of his DNA across the 21 alleles, which is, one, profoundly unlikely. And in addition, T.L. is a male, which means we know he has a Y chromosome. And in the electrophorograms, you can tell from the unbalance between the X and the Y that the major contributor is a female. So based on the data, there is no evidence that any of those other siblings are a contributor. And then based on the data, if they don't make sense, the only question to ask is an unrelated person. I don't understand that. So what's the role of internal validation in this case? So we have this idea that a lab has done an internal validation where they know the ground truth of the sample and then they can calculate the odds by which they can accurately detect the outcome. And I take it that they haven't done that process for related contributors, even though, as you described, they have protocols that address this and they can be highly confident about it. What do we do with the internal validation question? Is that a per se rule? There needs to be internal validation? Or if it's close enough to the facts of the case, it's okay? What do we do with that question? I think that's actually conflating two issues. The thing that the lab hasn't validated is using the related likelihood ratio. And because they haven't validated it, they didn't do it. The lab does have validated protocols for the number of contributors analysis, and that includes protocols for dealing with biological relatives. And I can give sites for that. First of all, Green testified to that at page 389. The procedures are in the appendix at page 677. It's in the Sutton Affidavit at page 278. The absence of internal validation with respect to error rates is really besides the point. That's right. The only thing that was not validated is the related likelihood ratio, which wasn't used here. Because the lab—and there was no expert who said it would be appropriate to use it under the facts of this case. And the lab, therefore, didn't use it. Sorry, didn't use what? The related likelihood ratio. So there's several steps in the process. Right. The first step is the number of contributors. I thought there was also a question about doing an internal validation even at the outset with respect to the number of contributors, that you could run an internal validation to say, okay, we know the ground truth of this sample, and we're just going to look at what happens when the lab applies all of its protocols and whether it's more likely than not or what the error rate would be in terms of getting it right. For the number of contributors? Yes. So the lab has protocols dealing with how to calculate the number of contributors. Those protocols are validated and assessed. So when Judge Morrison—because I think she's focused in part, as she pointed out, on the lack of validation with respect to the number of contributors. So all I can do is point to the record of what the lab director said and what the protocols that are in evidence that are validated. What the director of the lab, Sutton— So the procedures are at page 677. And I didn't know if Your Honor was flipping to it or if I should give other sites. I got it.  And then at page 680— Yeah, the 677, that's the 6.7 thing that says be careful.              677 is 6.3, which is the protocol for determining the number of contributors. And then 6.7 is at page 680, which addresses biological— The testimony was that all of their protocols are validated and are assessed both annually and quarterly. Green testified to that at page 389. That's what I was looking for.  So that's in the second volume of the appendix, page 389. So the government's contention is that the district court's assignment or conclusion insofar as it rests on a failure to conduct internal validations is just an error, a factual error. Yes. And so what Green says, the question was, where there is sufficient DNA for forensic testing, did USISL have validated procedures in place to resolve the number of contributors? Answer, yes. Now, the district court— In fact, she was asked on how many times or how many of her cases involved related contributors, and she said like 10 to 15 percent of the thousands of cases. That's right. She worked, right? It seems unlikely that 10 to 15 percent of the analysis of this lab, like, is admissible in court. Well, that's right. And that really does get to sort of the implications of this decision and part of the harm of this decision. The defense brief sort of attempts to say this is a one-off case, it's a unique case. But number of contributors is an issue in every DNA case. And crimes inside of families are unfortunately fairly common. As Green said, it's 10 to 15 percent. If there needs to be some other method for related people, which is effectively what the district court held, that method doesn't exist. Both Green and Califf have said there is one method. You use it both for related people and unrelated people. And that's because the math is the math and it doesn't change. So there is some suggestion about if you needed to do a likelihood ratio about, you know, the likelihood that the sample is one relative as opposed to another, they might send it to a different lab. So are you saying there aren't other labs that have – that are internally validated for running such an analysis? So that's the distinction, again, between the number of contributors and the likelihood. Oh, you're saying there isn't a separate methodology for number of contributors. That's right. Or it might be for the likelihood ratio. That's exactly right. And Green – and Green testified to that. The reason why this lab did not violate the methodology in doing the analysis is because when they do the number of contributors analysis, they have reasons for saying that the relevant comparator is not relative because we can tell from the peak heights that there isn't a masked child in the sample and we know that Joe has a unique allele or is very likely to have unique alleles as compared to the other sibling with a different father. That's right. And so then in terms of the regular methodology, it would be appropriate to run the likelihood ratio against the world. Exactly right. And the lab said if there were evidence that they needed to use the related likelihood ratio, they would have sent it to another lab. Thank you very much, Mr. Siegel. So we'll hear from your friend on the other side, Ms. Glasshouse. Thank you. Good to see you, Ms. Glasshouse. Good morning. Good morning, Your Honors. The Army lab was not validated to test family members' DNA. That is what the technical leader explained in his affidavit. Yet that is exactly what they did here. They tested a shared bed used by six family members, and the government didn't even tell the lab that four of those family members slept in that bed every single night. In this unusual case where this specific lab lacked the necessary validation. Can you tease out the two points you're making? So you said that they're not validated to test family members' DNA, but also that they didn't have all the information. That's right. But even if they had all the information and all the samples, you would still say they're not validated. So does it matter whether they had the samples or the information, or you just think as a categorical matter anything coming out of this lab that does DNA testing that involves relatives is just per se not reliable? No. So here we have a number of errors. So the first is the lack of validation, which the technical leader explains. They were not validated to test mixtures of biological relatives. Second is in the limited sense that they had any information about what to do with biological relatives, the Army lab said the thing to do is ask for reference samples and use those in your analysis. The lab tried to do that, ask the government for reference samples, meaning the actual DNA. In fairness, I mean, the protocol does say you should be very careful when they're relatives at issue, and you need to see if you can deduce the number of contributors, right? It says something like that. It says, like, if you can't, it might be that you're not able to make a determination. So here we have testimony that they were able to deduce it because, as we were just saying, you can tell that there isn't a masked contributor based on the peak heights. In fact, the fact that there's one stain that has a fourth contributor suggests that they were applying a methodology that would allow you to determine whether there's a masked contributor. And then we know that there's not a mistake with respect to the inclusion of Doe because she has a different father from, that's genetically different from anybody in the household. No. So this lab lacked a reliable method at each stage of the process. So they lacked a validated or reliable method to assess number of contributors when there were family members. They lacked the ability to use the STAR-MIX program, which is the program that labs generally use, that this lab used to test mixtures of biological relatives. What does that mean, they lacked the ability to use that? Well, the testimony was that there is some labs, other labs, have a feature of STAR-MIX that is designed for biological relatives. The technical leader explains that this lab doesn't have that feature and is not validated to use it if they had it. And then Green, the government's expert, testifies that what internal validation means is the lab has tested those types of samples and determined if they are reliable and that they have a method that they can use. What she says, Mr. Siegel quoted this, where there is sufficient DNA for forensic testing, did the lab have validated procedures in place to resolve the number of contributors? The answer is yes. So you're saying that she's wrong about that? No. She's also clear that the lab lacks that validation with respect to mixtures of family members. And she's lacking the information that there are four family members sleeping in the bed. And that's why that's... We should think about it. So, I mean, you're not saying that, you know, to the extent that the lab were testing DNA samples from unrelated contributors, like they have a whole process and it's all relevant and you don't dispute that it would pass 702, right? That's right. And so the question is, well, they have that method and is it reliably applied if you're using that method to figure out this problem before then, right? Now, they have arguments for why it is relevant, which is what I just talked about with the government, which is they explained why they could exclude masked children and why Jane Doe would be expected to have a different profile than the other half-brother. So the question is, are they right that their method can yield reliable results as applied to this sample? Or your position would be that no one adhering to the methodology would understand this method to yield useful results as applied to these facts. Is that the way we should understand the question to be decided? Not really, Your Honor. The lack lacks a validated method at all for family members. That's the fundamental point that you're making. Correct. Is that they've got validation through other procedures, for example, multiple donors and so on. But when it comes to possible multiple donors in the context of family members, they don't have the procedures or at least those procedures have not been validated in that lab, is that? Correct. And that's why this is an unusual case. It's specific to this lab and to these circumstances. May I ask you a question? Go ahead. But as I was saying before, I mean, there would be circumstances under which even under your view that you need the validated procedures, you could apply it to a case that involves relatives. So if, in fact, you know, you're testing DNA within a household and there's some relative who might have contributed to a sample, but, you know, the case-specific information shows that relative hasn't been in the house, you know, for over a year because he's away at college or something. You would say, all right, well, like, you could put aside the possibility that that relative was contributing to a particular sample and apply their method, right? So, like, you have to determine based on the facts whether the method that they have can yield useful results in this particular case, right? Sure, but they don't have a method. And to the extent they do, they need to get samples from the family members and condition is the phrase that they use. But the method, right, the question is, you're saying, well, I can't rely on the method when there's a key concern about contributions from family members. And they're saying, actually, that's not a concern in this particular case because you can exclude the contributions from family members for these scientific and, you know, case-specific factual reasons. So that's not... That's what, you know, that's the question, right? Whether this is a reliable method reliably applied means could you apply the method they have to these facts? Well, no. They lacked the data. So they lacked those reference samples that the lab required them to use with biological relatives. They lacked the information that two additional biological children slept in the bed. So they could not make a reliable number of contributors determination. They didn't have the information. With respect to masking... Right, but their argument is that you can make a reliable number of contributors determination without that information based on the analysis of the peak heights, right? But that's not supported by the testimony. So as their second expert testifies, peak heights are extremely... A number of contributors analysis is the hardest when you have biological relatives. That is because the biological children of their parents can get completely masked, particularly at low levels. That is exactly what their second expert testifies about. And they're relying now on his affidavit rather than his testimony in court where he admitted that his research applied directly to this circumstance. He, too, was missing the information that there were actually four relatives sleeping in this bed every single night. In addition to the two other family members who were using the bed during the day. So the experts are missing their relevant facts. That's under 702. They're missing their relevant data. And there is no reliable method. It's sort of weird you're saying that the experts are missing the relevant facts when the experts themselves say those facts aren't relevant. No, the experts... Here's how I can apply the methodology that I apply. And I don't see a problem of a masked contributor or of somebody else explaining the presence of those DNA. So their expert actually asked for help before court saying, do I have a problem? Because it turns out they're related. Two days before the hearing, she reached out to the government and said, can you explain these biological relationships? She asked for reference samples from the rest of the family and didn't receive them. And neither... These e-mails, is that correct? Yes, Your Honor. And neither expert ever got the factual information that there were two additional children in the bed. So we do not know, standing here today, how that would have impacted their analysis. We do know, right? I mean, doesn't that show that the analyst is being diligent? She wants information about their relatives. And then she says, that would not affect my number of contributors determination for the following reasons. And maybe, you know, you can say whether the reasons are persuasive or not, but that's what she says. Well, she doesn't say that because she never learns the information that there are two children sleeping in the bed. In fact, she says that she uses the fact that Monica, the wife, sleeps in the bed every night in order to condition, so to take Monica's DNA out of the sample and test the rest of the samples. That exact same logic applies to the other two children who are sleeping in the bed every night. Well, it doesn't really because Monica is an adult and, you know, she's having sex with her husband in the bed. I mean, there's... Like, there might be a difference between clothed children and an adult woman who's sharing a bed with her husband. So there's no testimony to that effect, and it's not correct, especially when you have one child who's wetting the bed. People shed their DNA. It's not related. The extent it's related to adult versus child is more. You're right about wetting the bed because that could show up in a certain way, and so, you know, there was a determination that it was laundered between the bed wetting and the analysis, but it wasn't laundered between the semen deposits and the analysis. This comforter was rarely laundered is actually what the testimony is. With respect to number of contributors, one of the reasons that the lack of validated method, the lack of information and data really matters here is we have actually four expected people contributing to the DNA on this bed spread. The lab is only generally validated to test when there are four contributors. So to the extent there... But we have six. Sorry. Yes, Your Honor. You said four. We have six, though, right? Exactly, and they're only validated even under their regular star mix for non-relatives up to four. But why isn't this the way... So if the question is does Jane Doe's DNA appear co-located with the semen stains, if, in fact, we know that Jane Doe has a unique allele as compared to the parents, what is the theory by which the evidence would be totally misleading? You think there's a way that Jane Doe's DNA is not actually present and that that's an adventitious inclusion? Yes, that's possible, Your Honor. How would that be possible if Jane Doe has a different father and has a unique allele? You went down that road with the government, as we don't know what the DNA sample is for her half-brother. So you're just saying it's possible that her half-brother has a father who happens to share alleles with the other father and happened to have passed the allele to the first child, and so just by chance Monica has had two children with two different fathers but they have identical alleles? So I'm saying that we don't know, but more likely, Your Honor, is that there are other children either instead of Doe or in addition to Doe that are in these samples, and the likelihood ratio here only compares the possibility that three Johnsons... Yeah, but if Doe has a different father, and therefore there's the presence of a separate allele, then, you know, you could say that that's extremely unlikely. Like, why is that not the... Like, can't you look at this evidence and be pretty confident that there isn't an adventitious inclusion of Jane Doe because she has a different biological father? No. So the analysts are clear that all they can do is have this likelihood ratio that compares the likelihood that three Johnstons are on the bed versus two Johnstons and a stranger. That's the only thing that they can show, compare the likelihood of these things. If, in fact... And the other thing that they do not do, excuse me, is test the rest of the comforter. So we do not know if all of the Johnstons... There's only parts of the comforter that it's in. Very small parts? How big are the parts? I understand them to be small. There is not evidence in the record about them being all in a particular corner. But I believe they test small parts. But one important thing to pay attention to is that Monica's DNA is present with... is likely to be present with in the same sample as likely Doe and Mr. Johnson, which really undermines the government's theory entirely. The experts are clear that they can provide no information about when or how any DNA appeared on this comforter. They can't explain what the DNA was on the rest of the comforter. And you have four family members sleeping in that bed. But isn't that something that goes... I'm not sure that that should be part of their analysis. Which, Your Honor? I mean, would you say that they didn't... I think what you said was that they didn't look at... The background testing? The whole background testing. Why is that their job? For it to be meaningful that somebody's DNA is more likely in this part of the comforter than in another part, you need to know if actually their DNA is all over the comforter. That is a standard part of the DNA testing, which they don't do here. And is that in the record? Yes, Your Honor. But that means that what they're saying is unreliable? Why isn't that something that's a subject of cross-examination? So they say we analyze the semen stains, we find Doe's DNA as a major contributor in five of the... or four of the six... whatever it is, as a major contributor in a certain portion of the stains. And then you can say, well, isn't that consistent with her just being in contact with the comforter in general? And so it doesn't show very much. Because Daubert gatekeeping requires the court to find for the government to prove that the method that is used is reliable. That is the court. But actually, Your Honor, the comment that you just made was not to say that the method isn't reliable. It's to say that, okay, maybe you can show that there was a co-location of her DNA and his DNA, but it doesn't tell you very much unless... because there could be DNA just sort of spread throughout the comforter. The district court's job here, which is what the district court did, was to gatekeep unreliable methods. The district court pointed to the fact that the lab lacked validation for likelihood ratios for StarMix with biological relatives, that the technical reader said exactly that, that there was a lack of fit between what the lab came out with and any fact of consequence in the case. So with respect to validation, which is the subject of my focus, are you aware of other labs, for example, other federal labs or state labs that have validated their procedures for family members? Yes, Your Honor. Okay, and is that common validation across labs? In what way is this particular lab unique? It's unique because it lacks that validation, both for StarMix that does have a particular part of the testing program for biological relatives. They don't have it. They don't use it. They haven't tested it. Was there testimony about other labs? Was there evidence about other labs? Yes, Your Honor. I can't point you to a site right now, but the defense does introduce evidence of other labs that do do this type of testing and that this lab is unique. Implicit in the affidavit from the technical leader is that other labs do have this StarMix program to calculate likelihood ratios relating to biological relatives and that they send these samples out to other labs. I take it that part of your broader argument is that this is an exercise of broad discretion. Definitely, Your Honor. On the part of the district court and that it could consider all of these issues, problems in assessing the reliability of the proffered expert testimony. Is that right? Exactly, Your Honor. The government needs to show manifest error. They have made really no attempts to point to particular parts of the district court decision that is wrong. The district court has substantial… Well, let's say that Mr. Siegel said that that part of the district court's decision in which it said that the validation was lacking is wrong, but what you're saying is that it's a little bit more precise validation with respect to situations where family members… That's right. Everybody agrees on that point. The government's experts, the technical leader agree, and it says that there is no written process or procedure for mixtures with biological relatives. Are you aware of a decision anywhere in the country where the failure of validation was identified by a district court as a reason, under Daubert, to reject the proffered testimony or expert opinion, and that was reversed by a certain court? I think the more… So Ortiz and Williams are two cases where the district court finds, in part, the lack of validation is a reason to exclude the evidence. Those are not overturned. More commonly in the circuit decisions are that this circuit and others rely on the validation as a reason to affirm the district court's decision allowing evidence. And that is because, as the expert explains, internal validation is how DNA labs determine if their methods are reliable. So your view is that the converse is also necessarily true, that we should affirm when there is an absence of relevant… I'm not saying using relevant in four or three contexts, but absence of relevant validation. Is that… Definitely, Your Honor. And this case makes it even easier for the court because it's not just the absence of validation. It's also the absence of necessary facts and the absence of necessary data. So it's numerous errors, and the district court makes those findings. So the absence of necessary facts, I'm just trying to understand the argument. It relates to this specific case where the data was not provided, for whatever reason, to the appropriate panelist, to Green. Exactly, Your Honor. So it's this specific lab in this specific case, and the district court makes clear that it's a narrow decision on this unusual… It's not a question about whether the methodology is reliable, right? It's a separate question about whether they have enough data to apply the methodology. Right. You're also making that argument. Well, yes, and they're both reasons to exclude the evidence. In terms of the validation, your argument is… So if it were the case that they lack internal validation for the LR determination, but only the LR determination, that would not be a reason to exclude the NOC information, right? To exclude the what? The NOC, the number of contributors information. It would, Your Honor. So as the analyst explains, they cannot report any results of the DNA without a statistical analysis, and that's the likelihood ratio. Without the likelihood ratio, they cannot report the DNA results. If the likelihood ratio was unreliable or not relevant or something, why wouldn't the expert be able to explain why they made the NOC determination and why they believe that you have the presence of the three individuals in the sample? So that's not what the expert determines. So the DNA experts, and this is true across labs, report DNA results by now most commonly with the likelihood ratio, comparing the likelihood that these people contributed versus the likelihood… You are saying, actually, that everything stands or falls with the internal validation for the likelihood ratio. There are numerous independent ways to affirm this decision, and that is one. Only on that one, this court can affirm. In terms of legal errors, based on what you were saying a moment ago, so the government does say, you know, the district court is saying that it's not reliable because the lab doesn't test the defendant's theory. Maybe the defendant would prefer that you test the theory against related individuals, but it's reliable and it is a correct result to say this is the likelihood that the DNA belongs to these individuals as compared to unrelated individuals, and the expert says I think that's the appropriate test to run. No, Your Honor. Why would it be the case that it's not reliable because they don't do what the defendant, the test the defendant would have preferred to do? So that's not what the expert testifies. The expert testifies that she was limited by the information she received. This is green. That was green. And then Caliphate explains that with bad information, the analyst can only use the information they have. Green is very clear throughout her testimony that she is only able to report the results based on what she knew. And she, and that, I think we have. Hypothetically. I mean, I don't want to get into the particular facts. Like, hypothetically, if the expert had said, you know, I can exclude the relative contributors based on peak heights and the unique allele of the one child, and so, therefore, by the time I get to the likelihood ratio, I think it's appropriate to run our normal likelihood ratio because I don't think there's a chance of the relative contributors contributing to this sample. And so, therefore, I'm applying, you know, the established methodology as I see is appropriate. How would we navigate that? Would you say it's an appropriate methodology, but I just don't think that this is good information because they're not accounting for the, because I don't think it's right that they've excluded the possibility of the relative contributors. Now we go to Wade, right? No, Your Honor. So what Green testifies is that she never took relatedness into consideration at all. Yeah, no, but that's why I'm making it a hypothetical. So, like, let's say. If she had conditioned on the other. She testifies, I'm excluding the possibility of a relative contributor based on my analysis of the peak height ratios and so on. And by the time I get to the likelihood ratio, I just don't think it's possible that there's a confounding relative contributor. And so I'm going to just do our standard likelihood ratio. You recognize that that is an established methodology. So what would the problem with that be? Because that would be Green not even following her lab's own limited process to deal with mixes of family members. So if an analysis is just going to do something that's different than even her lab says to do, even the limited process is not valid. It would be impossible to exclude the possibility of the masked children based on the peak height analysis. Well, what her lab says to do in this situation, to the extent they say anything, is to get the reference samples for the other family members and use those reference samples to assist in the analysis. That's what she does to deal with Monica being a relative. She's unable to do that for the other three. I have a question about that. Because the government says in its reply brief, we didn't think it was necessary to get the samples from the other kids, but we could. So if they had, or if they do still, I'm not sure what the posture would be, but let's assume that you did have the other samples. Would that mean that you would not have an objection to the methodology? Well, the government, if this court affirms and it's sent back down, the government can try to cure the problems with the lab. That would be up to the government. How would I evaluate the scope of your objection to the evidence? So, like, let's say they did get the samples and they did account for the comparison to the samples, but they're still relatives. So would you still say it's an unreliable method, or if they did get the samples, it would be reliable? It's a little difficult to say, right, because we don't know what that would show at all. And that's at base what the problem is here. That's the reliability Daubert problem. Right. So the point of Daubert is to gatekeep unreliable methods, especially when none of us know what the outcome would be, if even some more reliable, if not the most reliable. Would you just, maybe I've forgotten or maybe I just never knew, was there a certification from the government that it could not proceed without this evidence, that the expert evidence? I don't, I believe they just did a normal interlocutory appeal, Your Honor. And then just about the relevance and the prejudice. So I was saying earlier, you know, the district court says this evidence doesn't make it more likely that one version of events is true or the other version of events is true because you could interpret it different ways. But doesn't that show that it's relevant? I mean, if there's a piece of evidence that, depending on how you interpret it, could support one or the other theory, that means it's relevant to the question to be decided, isn't it? Well, no, Your Honor. It's not relevant to a fact of consequence, which is what the relevancy analysis requires, because all it shows is the likelihood that three Johnston family members who we know used this bed compared to the likelihood that two Johnston family members and a stranger were in this area of the bed. But that's your theory that it's only Johnston family members. I mean, they have arguments based on the presence of the unique allele and the placement of the things that it shows one thing. I mean, you have arguments as to why it doesn't show that. I get that. But if you're debating over how to interpret it, doesn't that mean it's relevant? Well, no. The likelihood that a stranger versus Mr. Johnston was on his bed is not relevant to anything in consideration in this case. And then in terms of prejudice, the district court just says, I think the jury is going to just assume. They're going to hear there's DNA, and they're going to assume that he's guilty. I mean, isn't that the kind of thing that we always cure by vigorous cross-examination and by jury instructions? Like, why would it be the case that if the district court thinks the jury is going to read too much into the evidence, the district court can't address that problem by instructing the jury as to how to consider the evidence or by telling the advocates how to describe the evidence? Because Daubert is clear. One of the reasons for Daubert is gatekeeping. Even if it passed Daubert, I would still say it's too prejudicial. So, like, let's assume that we get past Daubert, and now we're just talking about overly prejudicial. Why isn't this the kind of thing that we deal with with jury instructions and cross-examination? Right, because Daubert explains that expert testimony has a very high risk of prejudice. That's why expert testimony is treated differently. Juries have difficulty understanding it. This is extremely complicated information. And the government's own briefing, the way that they have acted, like this evidence shows more than it does, just shows that potential prejudice. This is exactly what Daubert is designed to avoid, to avoid the prejudice from the jury hearing unreliable scientific evidence and the jury lacking. But your answer depends on Daubert. And if it were reliable and showed what it purported to show, to the extent that the jury might read too much into it, that is something that the district court could instruct the jury about, right? The district court properly decided on each of these independent grounds to exclude this evidence. On Daubert reliability for the likelihood ratio, on Daubert reliability for the number of contributors, and underlying both of those, the lack of facts and data, and then independently on its lack of relevance. I mean, I'm having a little hard time, a little bit of a hard time if you get past Daubert. In other words, and I think that this is the district court judge's analysis, if you get, if I determine under 702 that this is sufficiently reliable and so on, it's irrelevant because this particular fact doesn't make it more likely than not that the defendant is guilty or innocent, whatever it is. But it's not, well, it's never about a particular fact that makes it more likely. It's whether this fact, among other constitutive facts, makes it more likely or not that a result X exists. So I think that there was a, I think maybe there was a mistake in the analysis, but correct me if you think I'm wrong. Relevancy requires that it tend, have a tendency to make a fact of consequence more likely. We don't have that here because whether the likelihood of a stranger versus Mr. Johnston being on his comforter is not relevant to any fact of consequence in this case. Thank you very much. We'll hear from you. Thank you, Your Honor. Your Honors, I think there were a lot of what ultimately amount to factual questions about the record, and I'd like to point to some record sites to address some of the questions that each of you asked. So Judge Minasci, you asked about in the record, is there testimony about whether this is the appropriate method to use for related or unrelated, whether that makes a difference. Green and Caliphate both testified about this and said it doesn't matter. It's the same method. That's at page 566 for Green, page 790 and 803 to 804 for Caliphate. And Caliphate explained why at page 862. He said for peak height ratios, the math is what the math is, and that's true for related or unrelated people. I can repeat any of those, but I guess it's recorded. In terms of the claim that there was not a validated process for number of contributors, that's not accurate. No, no, no. For family members. And that the protocols include considerations for family members. So let me read from the Sutton Affidavit. The Sutton Affidavit at page 286, which is in the first volume of the appendix. And so if the evidentiary data is too complex to resolve biologically related contributors, then USACIL will report accordingly. So part of the protocol is to consider the risks of related people, and if it makes it impossible to interpret, to not interpret it. But if there is sufficient data, i.e., high quality and well-resolved DNA recovered from the evidence to resolve the contributors, which the experts testified was the case here, then USACIL has validated procedures in place to potentially exclude one or more relatives based on the presence or absence of genotypes from unshared genetic information to narrow down whose DNA may be present. Those procedures can include things like specifically considering the possibility of relatives being in the mixture, and that was done here at page, and that's at page 514 to 515. What page are you reading from? I'm sorry. That was page 286. That's okay. I mean, maybe this is a semantic difference, but, like, you could understand that as being there is a validated procedure that applies to samples that include relatives, or it could be we have a validated procedure to evaluate samples as compared to a stranger. The question is whether when we analyze the sample, we can distinguish among the possible relatives to the extent that our established procedure that's focused on non-relatives could still yield reliable results. I don't know if it matters which is which, but, and maybe it doesn't, but that's the way you could understand that statement, right? So it's a two-step process. At the first step of resolving number of contributors, there is a validated procedure. It does account for related people, and the experts agreed that for related or unrelated, it is the same methodology, and no expert nor the district court has ever pointed to any other methodology that could be used or should be used for the number of contributors analysis. The only thing that is — I guess what you would say is also, like, they have procedures that say we could encounter a scenario where the relatedness of the possible contributors is so confounding that we would say we can't reliably apply our methodology. And so they have a process that determines whether that's the case in that particular case. That's right. The only thing that is not validated is when you get to the likelihood ratio, which is the last step of whether you can apply the related person likelihood ratio. Here, what the experts said is it doesn't make sense to apply the related likelihood ratio for exactly the reasons you gave in your hypothetical. There is no evidence that there are any other children involved. There's a lot of talk about there could be six contributors, but they looked for that. They looked for that evidence. And this claim that they didn't consider that evidence is, again, belied by the record. So Green testified that she knew that other kids might — other kids' DNA might be on the bed, and she considered that in her analysis. That's at page 510 and at pages 514 to 515. She said that either sleeping on the bed or playing on the bed could potentially leave DNA. That's at page 495 to 496. And what she ultimately concluded, despite considering the possibility of related people, is that there was no evidence of other children in any of these mixtures except Stain 23. That's at page 537 to 538, 566, and 579. Caliphate agreed at pages — Even that process where she excludes them based on peak heights and that kind of analysis, it is still just based on likelihoods, right? And so the likelihood ratio, if you were comparing it to unknown relative contributors, would be lower than the ratio compared to unknown nonrelative contributors, right? Well, as for the defendant's children, as we talked about before and as Caliphate said, they can be ruled out. That's not even a likelihood ratio. They cannot have alleles that their parents don't have. So you're saying the method they applied excluded the children in the household, and so actually you just need to run a likelihood ratio against random chance with the world. That's right. And we know from the record that the two children are the biological children of Johnston and Monica? There are three children. Two of them are the biological children. And how do we know that? It's in the record. But by self-report? Yes. Because they haven't been tested, right? So we don't actually know who their parents are. That's right. I mean— Presumably we know that Monica is their mother, but we can't know for sure without the testing whether Johnston is the father, right? That's true, but at a certain point you get into a level of— I'm stopping the question, but that's not—  Because they were never tested, right? So we don't actually—we don't know for sure. That's right. There's never been any argument but that they are the children of whoever one believes they are. But actually if they're not the children of Johnston, that would make it even less likely that they would be confounding the DNA results, right? Because there'd be a registered biological parent, right? Certainly as to Johnston. And so, again, Talbot talked about this in his affidavit. That's at pages 205 to 206, that because it doesn't — this evidence does not support the inclusion of any of the known relatives, the appropriate one to run is the unrelated. Can I ask what to do with your — the point that you make that says, you know, if it's necessary we're prepared to do the swabs on the other children and get that data? Is it — would it work the way opposing counsel suggested that, you know, we would just have to decide this case on its own and then you could sort of seek to introduce different evidence before the district court? Or is there a relationship between the case that we have and the possibility of getting the other swabs? I think it would depend on exactly what the ruling was. If the ruling was the fundamental flaw here was the lack of swabs, then we could cure that. But the problem is, is that runs headlong into the testimony of both Green and Caliphate who said they did not need the swabs. Green testified, and this is at page 515, if I needed — if I needed additional references, I would have asked for them. And I should be clear, the lab at the very beginning, before the testing was even done, did ask for them. They did say it might end up being inconclusive without them.  That's at page 200 of the sealed appendix. But then they did it. And because this was such high-quality DNA, because of the amount of unique alleles, they determined they didn't need it. And the final thing I want to talk about, just to get to Judge Lohier's point about this being an abuse of discretion, and it's not enough just to say we have to disagree. This has to be clear error. In terms of the claim that there should have been a different methodology used for a number of contributors, that is clear error. There — no expert has ever said there should have been a different methodology. Every expert said this was the right methodology, that you still does have procedures for it. And the studies that the Court cited claiming that there is a high error rate involving related people, none of them — none of them actually say that. And I know I'm out of time, but I think the studies are important, and I would like to — Well, I get that in Calif. But it actually says, you know, it's a pretty stylized scenario where you would get a high error rate and so on. But Ms. Glashauser addressed this a moment ago, and she said, well, the way you report the results is through the likelihood ratio. So if there isn't — if they're not reliably applying an established methodology to the likelihood ratio, there just are no results to report, and then that just infects the NOC determination as well. Well, that's — that's right. But there's no question that the likelihood ratio they applied is reliable. No one is disputing that the likelihood ratio they applied is the right likelihood ratio to apply if you're considering non-relatives. The question is really one of relevance of should they have done that, or would it be more relevant to consider the relatives? So at 515 — and I do want to focus on this discretion issue. But at 515, question, okay, but without the reference samples, because the lab doesn't have validations for untyped or unknown volatilities, you couldn't specifically take into — take it into consideration, right? Answer, not in the likelihood ratio, no. That's right. So the only place where they weren't able to consider the presence of relatives is in calculating that likelihood ratio. They used the unrelated likelihood ratio. I don't think that's in dispute. The question is, was that the appropriate like — was that the appropriate likelihood ratio to use? And if there was a question of maybe this is a relative, maybe there's evidence that this is a relative, then that's exactly why they have protocols to say it might be that we can't report. But here they determined that the appropriate ratio to use was the unrelated likelihood ratio. I think that there was also evidence that Ms. Glashauser mentioned that they — they did not have this picture that I think you are assuming they may have had about the presence of other relatives on the — on the bed. Well, that's — Green testified that she was aware that there were other kids who used the bed and that she — and that she was aware of their related status. That's on pages — Other family members or other kids? Other — other family members. Okay. The only thing — the only piece of new evidence that is what the defendant is pointing to is that after the Daubert hearings, there was an interview with Doe where she said, my younger siblings slept in the bed. So it was known that there were other kids. It was known how they were related. It was known that they played and roughed house on the bed, and that's why Green considered the possibility of their DNA being on the bed. The only thing that wasn't known was that they would also sleep in the bed, but Green did testify that whether it's sleeping or playing on the bed, they could both potentially leave DNA. And that's, again, at page 495 to 96. So Green considered the possibility of people being related. She looked for that evidence, and she testified again and again, I did not see that  There is no evidence for those people to be there. And what — what Daubert requires, what science requires, is that you follow the evidence. She looked at the evidence. She determined there was no evidence for those other children. You're making an argument that it actually was the right thing to do, to do a likelihood ratio against the world. That's right. Would you agree that even if somebody could say it would have been better to do a likelihood ratio against the possibility of a relative, the likelihood ratio they did do still communicates reliable and relevant information, and to the extent that, you know, you want to argue that something better would have yielded a different result, that's for cross-examination? That's exactly right. And Daubert says that. Where there is a scientific method being used, where it's a reliable method and it's reliably applied, any disagreements about that, that goes to cross. And no expert has said that Green did anything wrong, that she followed the wrong method, that there's something that she should have done that she didn't do. Can you, just to go back to this discretion point, would you, are there cases in which we have reversed a Daubert decision that excluded expert testimony, not because there was insufficient analysis by the district court, but because of manifest error? Well, at least in part, the FISA case. In that case, and analogously here, there were some issues with the expert testimony that the district court pointed to, and the district court excluded everything. This Court reversed and said, you're right about those limited issues, but it's an abuse of discretion to exclude them all. And that's, and we cite that for the principle that. Go ahead. For the principle that while the district court points to some issues with Stain 23, they then said, the district court then said, well, now I'm excluding everything. That's not quite the core of the district court's 702 analysis, but is there, is there one, is there a case where the district court has found the entirety of the analysis more or less unreliable, and we have reversed? No. Take a look at that. I mean, Cassandra's the Sixth Circuit, and that's a DNA case and does address many of these issues. I think. We have said, and other courts have said, that STR mix and reporting these results is a reliable methodology, and so the question is, you know, is it unreliable to apply what we've recognized as a reliable methodology to these facts? Yes, but I think, I think this case is an outlier. It's hard to say have we. Well, she agrees. Well, but I think the analysis in this case is an outlier. I mean, we've already talked about, and I think Your Honors have talked about the errors in the 401 and the 403 analysis. In claiming that there, that this NOC analysis is unreliable, when in fact it is the generally accepted method, and that there is nothing in the record to suggest that there is any other method that should have been used. To say that it is a violation of Daubert to use the likelihood ratio that the experts determine should be used based on their own protocols. On the Pfizer analogy, I guess you would say, well, look, to the extent that she's relying on disagreements among the experts or the possibility of a confounding contributor, a related contributor, you know, there was something in the record from which you could make an inference with that with respect to rule, stain 23. There just wasn't that indication in the record or between the expert testimony for the other stains. That's right. For every stain other than stain 23, every expert agreed with the ultimate conclusions. Every expert agreed that the right method was used. There was no dispute from that. And in terms of just the manifest error, I think the Court's reliance on studies and cherry-picking from the studies really emphasizes that, because this does become sort of a scientific issue. The district court cited the Mix 13 study and said that that showed a 69 percent error rate. There's an analysis of that study in the appendix at page 1060. And if you look at page 1069, what that says is that at the time, only one lab was using probabilistic genotyping software. That one lab got it right. And since then, follow-up analysis has shown that probabilistic genotyping software like StarMix gets it right. So what the Court presents as something that shows a high error rate actually shows that technologies like StarMix is reliable and gets it right. The district court cites the Dembinski study, which is available on the district court docket at 103-25. That is a study of the maximum allele count method, which Judge Merriam mentioned at the beginning, which was not used here and Caliphate said is wrong. The fact that that outdated method that was not used here has a high error rate says nothing about whether the method here has a high error rate. The Coble study that the district court cited, which is available at page, excuse me, at docket entry 103-24, the district court characterized that as a study of analyst error rates. But in fact, that is a mathematical study of the maximum allele count method, which wasn't used here. And I'm just going to quote from the — Mr. Siegel, I take it all examples that you would ask us to consider in assessing whether the district court manifestly erred. That's right. Because if the district court bases its holding that this is unreliable on studies that say there's a high error rate, but none of those studies are actually studying the methodology at issue here, that's clear error. And so this is almost a form of the FISA error. That's right. Thank you very much. And the last study is just the district court did ignore Caliphate's testimony about his study that said that there was a low error rate for unbalanced mixtures involving family members, which is here. That's at 800-805-807-865. Thank you. Thank you. Thank you very much. Very well argued, not surprisingly, by both sides. Very helpful. We'll reserve decision.